CLINCHFIELD COAL
COMPANY, Plaintiff,

v.

Donald HODEL, Secretary of the United States Department of Interior and United States Department of Interior, Defendants.

Civ. A. No. 85–0113–A.

United States District Court,
W.D. Virginia,
Abbington Division.

June 20, 1985.

On Motion for Reconsideration
Sept. 25, 1985.

Elsey A. Harris, III, Norton, Va., for plaintiff.

Elizabeth S. Tonkin, Judith A. Williams, Office of the Field Solicitor, U.S. Dept. of the Interior, Knoxville, Tenn., Morgan Scott, Asst. U.S. Atty., Abingdon, Va., Donald Hodel, Secretary Dept. of the Interior, Washington, D.C., for defendants.

## MEMORANDUM OPINION

KISER, District Judge.

Plaintiff Clinchfield Coal Company seeks review of an adverse determination of Administrative Law Judge McGuire which denied Clinchfield Coal's Motion for Temporary Relief. The jurisdiction of this Court is based on 30 U.S.C. § 1276(c) and 43 C.F.R. § 4.1267(b).

### I. *Statement of Facts*

Clinchfield Coal Company is the permitee of a surface coal mining operation located in Dickenson County, Virginia. Permit No. 1100406 was issued to the Big Spruce Pine Mine on December 20, 1983, by the Virginia Division of Mined Land Reclamation. The permit for this mining operation provided for the creation of a durable rock fill for the disposal of spoil material. Such fills are also known as "head of hollow" or "valley" fills, depending upon the configuration of the fill. The durable rock fill in question is commonly known as Sycamore No. 5. It consists of a series of terrace lifts that range between twenty and seventy feet in width. Drainage for the fill is provided by the construction of diversion channels which divert rain and water runoff from the fill and into sediment ponds at the base of the fill. These diversion channels are the focus of this case.

All surface mining in the United States is regulated under the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1201, *et seq.* ("Surface Mining Act" or "the Act"). The Act is a comprehensive statute designed to establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations. 30 U.S.C. § 1202(a). The Office of Surface Mining and Reclamation and Enforcement (OSM) within the Department of Interior is charged with the primary responsibility for administering and implementing the Act by promulgating regulations and enforcing its provisions. The Act sets out a two-stage program for the regulation of surface coal mining: an interim regulatory phase and a subsequent permanent phase. Under Section 503 of the Act, any state wishing to assume permanent regulatory authority over surface coal mining operations on nonfederal lands within its borders must submit a proposed permanent program to the Secretary of the Interior for his approval. The proposed program must demonstrate that the state legislature has enacted laws implementing the environmental protection standards established by the Act and accompanying regulations and that the state has the administrative and technical ability to enforce these standards. 30 U.S.C. § 1253.

The State of Virginia filed such a regulatory program, which was approved effective December 15, 1981. With this approval, Virginia achieved "primacy" under the Act. The Division of Mined Land and Reclamation ("DMLR") is deemed the regulatory authority in Virginia for all surface coal mining and reclamation operations. 30 C.F.R. § 946.10. However, the Secretary of the Interior retains certain oversight authority in states which have attained primacy. This authority is set out at 30 U.S.C. § 1253 and § 1271.

Clinchfield Coal's original permit provided that the diversion channels for the Sycamore No. 5 fill would be constructed in

natural ground at each side of the fill. This was done to comply with what Clinchfield Coal perceived to be appropriate interpretations of the Interim Program regulations governing surface mining. On February 18, 1984, Clinchfield submitted Amendment No. 1 to its permit. The amendment proposed relocating the diversion ditches to the interface between the fill and the natural ground next to the fill. It was felt that this approach would be a more economical and environmentally sound construction procedure. This amendment was sought based upon an interpretation of the Virginia version of the Permanent Program regulations, specifically V816.71(d).[1] The amendment was reviewed by DMLR, and approved on April 4, 1984.

On September 17, 1984, an OSM inspector visited the Sycamore No. 5 site along with a representative of DMLR as part of a statistical sampling inspection. OSM Inspector Blevins observed the location of the diversion ditches, and informed the DMLR representative that it was OSM's position and Blevins' interpretation of the current regulations that diversion ditches of this nature should be located off the fill on natural ground. On September 25, 1984,

OSM issued a ten-day notice (No. 84–13–290–10) concerning the alleged violation at Sycamore No. 5. That notice stated that if the state regulatory authority failed within ten days after receipt of the notice to take appropriate action to cause the violation to be corrected, or to show cause for such failure, then a federal inspection of the coal mining operation would be conducted and appropriate enforcement action would be taken.

DMLR declined to take any action, and notified OSM that the diversion ditches were being constructed under revised plans which were approved by DMLR pursuant to Section V816.71(d). OSM then conducted an additional inspection on November 9, 1984, to determine if the alleged violation was still occurring, i.e. whether the diversion ditches were still located on the fill. On November 15, 1984, Notice of Violation ("N.O.V.") No. 84–13–290–12 was issued to the Clinchfield Coal Company. The violation cited was a failure to divert surface water run-off from the fill into properly designed channels located off the fill in natural ground as required by Virginia regulations V816.74(d), (e) and (f) and 30 C.F.R. § 816.73(f).[2] In response to the po-

---

1. Section V816.71, Disposal of Excess Spoil: General Requirements.

      \*     \*     \*     \*     \*     \*

    (d) Slope protection shall be provided to minimize surface erosion at the site. Diversion design shall conform with the requirements of Section V816.33. All disturbed areas, including diversion ditches that are not rip-rapped, shall be vegetated upon completion of construction. The diversions shall be placed in natural ground unless an alternate plan or design is approved by the Division.

2. The relevant provisions cited in the N.O.V. are set out below:

Section V816.74, Disposal of Excess Spoil: Durable Rock Fills:

    In lieu of the requirements of Sections V816.72 and V816.73, the Division may approve alternate methods for disposal of hard rock spoil, including fill replacement by dumping in a single lift, on a site-specific basis provided the services of a registered professional engineer experienced in the design and construction of earth and rock fill embankments are utilized and provided the requirements of this Section and Section V816.71 are met. For this Section, hard rock

spoil shall be defined as rock fill consisting of at least 80 percent by volume of sandstone, limestone, or other rocks that do not slake in water. Resistance of the hard rock spoil of slaking shall be determined by using the slake index and slake durability tests.

      \*     \*     \*     \*     \*     \*

    (d) Surface water runoff from the areas adjacent to and above the fill shall not be allowed to flow onto the fill and shall be diverted into stabilized channels which are designed to pass safely the runoff from a 100–year, 24 hour precipitation event. Diversion design shall comply with the requirements of Section V816.33.

    (e) The top surface of the completed fill shall be graded such that the final slope after settlement will be no steeper than 1v:20h (5 percent) toward properly designed drainage channels in natural ground along the perphery of the fill. Surface runoff from the top surface of the fill shall not be allowed to flow over the outslope of the fill.

    (f) Surface runoff from the outslope of the fill shall be diverted off the fill to properly designed channels which will pass safely 100–year, 24–hour precipitation event. Diversion

sition taken by DMLR, OSM noted that the federal regulations state that surface water run-off from areas adjacent to and above the fill is not allowed to flow onto the fill and is supposed to be diverted into stabilized channels located off the fill.

... It should be noted that Section V816.71(d) of VCSMR is located under the general fill requirements and should not be construed to govern the construction of durable rock fills since they are governed by a separate specific set of criteria. Specific design and construction criteria contained in Section V816.74, *Disposal of Excess Spoil: Durable Rock Fills,* would take precedent over any criteria contained in Section V816.71, *Disposal of Excess Spoil: General Requirements.* Therefore, N.O.V. No. 84–13–290–12 will be issued requiring the operator to relocate the diversion channel serving this fill in such a manner to conform with the requirement set forth in VCSMR § V816.74(d)(f)(e) and 30 C.F.R. § 816.73(f) due to the inadequate response received from the regulatory authority on TDN No. 84–13–290–10.

OSM Comments of Disposition on Notice 84–13–290–10, (November 15, 1984).

Clinchfield Coal filed an application for review of and temporary relief from this N.O.V. A hearing was held before Administrative Law Judge McGuire on February 4, 1985. That hearing was limited to Clinchfield Coal's application for temporary relief.[3] On March 7, 1985, ALJ McGuire issued an opinion denying temporary relief. Clinchfield Coal appealed to this Court, and the matter was remanded to ALJ McGuire for additional findings of fact and conclusions of law as required by 43 C.F.R. § 4.1127. Those supplemental findings of

design shall comply with the requirements of Section V816.33.

30 C.F.R. § 816.73, Disposal of excess spoil: Durable rock fills.

The regulatory authority may approve the alternative method of disposal of excess durable rock spoil by gravity placement in single or multiple lifts, provided the following conditions are met:

\* \* \* \* \* \*

(f) Surface water runoff from areas adjacent to and above the fill is not allowed to

fact and conclusions of law were filed on April 9, 1985. Clinchfield Coal now appeals to this Court for judicial review of the ALJ's decision denying temporary relief. Such immediate direct appeal is authorized by 43 C.F.R. § 4.1267, which provides that any party desiring to appeal the decision of an ALJ denying temporary relief may appeal to the Board or, in the alternative, may seek judicial review pursuant to Section 526(a) of the Act, 30 U.S.C. § 1276(a).

## II. *Standards for Judicial Review*

The Surface Mining Act provides specific statutory procedures for the judicial review of administrative decisions. It also sets out venue provisions for various challenges, the standard of review, and the prerequisites for temporary relief.

30 U.S.C. § 1276(b) states that all complaints and petitions must be heard solely on the record before the Secretary and that the findings of the Secretary, if supported by substantial evidence on the record as a whole, shall be conclusive. Any action subject to judicial review under Subsection (a) shall be affirmed unless the Court concludes that such action is arbitrary, capricious, or otherwise inconsistent with law. 30 U.S.C. § 1276(a)(1).

As a preliminary matter, this Court must determine whether venue is proper in the Western District of Virginia. The statute provides that:

Any action of the Secretary to approve or disapprove a state program or to prepare or promulgate a federal program pursuant to this chapter shall be subject to judicial review by the United States District Court for the District which in-

flow onto the fill and is diverted into stabilized diversion channels designed to meet the requirements of § 816.43 and to safely pass the runoff from a 100–year, 6–hour precipitation event.

**3.** A hearing on Clinchfield Coal's request for permanent relief was held before ALJ McGuire in May of 1985. A decision on the merits has not been rendered at this time.

cludes the capital of the state whose program is at issue. Any action by the Secretary promulgating national rules or regulations including standards pursuant to Sections 1251, 1265, 1266 and 1273 of this Title shall be subject to judicial review in the United States District Court for the District of Columbia Circuit. Any other action constituting rule-making by the Secretary shall be subject to judicial review only by the United States District Court for the District in which the surface coal mining operation is located.

30 U.S.C. § 1276(a)(1).

■ The parties have assumed venue to be proper in the Western District of Virginia. For the limited purposes of this request for temporary relief, I believe this conclusion is correct. The adverse decision on appeal involves the denial of temporary relief from a cessation order issued in the Western District of Virginia. However, this Court must take note of the decisions of the Fourth Circuit in *Commonwealth of Virginia, ex rel., Virginia Department of Conservation and Economic Development v. Watt,* 741 F.2d 37 (4th Cir.1984), and the earlier case of *Tug Valley Recovery Center v. Watt,* 703 F.2d 796 (4th Cir. 1983). As will be explained in more detail below, this case involves more than simple regulatory interpretation. It is possible that this case is best characterized as an attack on administrative action taken in accordance with the Secretary's regulations, which amounts to an attack on the regulations themselves and must be heard in the District Court for the District of Columbia. *Comm. of Va. v. Watt,* 741 F.2d 37, 40. Alternatively, this case might be characterized as a partial disapproval of a state program, and thus only subject to judicial review by the United States District Court for the Eastern District of Virginia. However, this Court already has venue and jurisdiction because of the manner in which the case was brought before the Court. My initial impression is that I would have authority to resolve any issues raised by the facts of the case. These jurisdictional questions may need to be more carefully examined should the case return to this Court on the merits of the underlying N.O.V. For our present purposes, I will assume that jurisdiction exists and that venue is proper.

### III. *Prerequisites for Temporary Relief*

The Surface Mining Act provides that a district court may grant temporary relief pending final determination of the proceedings if three conditions are met:

(1) All parties to the proceedings have been notified and given an opportunity to be heard on a request for temporary relief;

(2) The person requesting such relief shows that there is a substantial likelihood that he will prevail on the merits of the final determination of the proceeding; and

(3) Such relief will not adversely effect the public health or safety or cause significant imminent environmental harm to land, air, or water resources.

30 U.S.C. § 1276(c).

There is no real dispute concerning the first and third of these elements. The first element is satisfied because hearings have been held before ALJ McGuire and now before this Court, and both Clinchfield Coal and the Office of Surface Mining have been represented. Although ALJ McGuire did not rule on the third element—whether the requested temporary relief would adversely effect the health or safety of the public or cause environmental harm—the record before the ALJ sufficiently demonstrates that it would not.[4] The only evidence on this point by OSM dealt with whether the diversion ditches, as constructed, could withstand a 100-year, 24-hour precipitation event. There was some testimony that if the diversion ditches were designed properly, they were not being constructed in a

---

**4.** The Transcript of Proceedings Before the U.S. Department of Interior, *In the Matter of Clinchfield Coal Co. v. OSM,* No. MX 5–39–R, dated February 4, 1985, has been reviewed by this Court. All references will be to Tr. at ——.

manner that would meet the performance standards set out in the federal and Virginia regulations. OSM inspectors stated that the size of the rip-rap was too small to accommodate a 100-year, 24-hour event, and that erosion was already occurring in certain places along the diversion ditch. (Tr. at 192, *et seq.*).

This testimony was countered by employees of Clinchfield Coal and independent engineers who have monitored the site since the OSM inspections. The overwhelming evidence was that the problems that may have been occurring, if any, have been corrected. (Tr. at 57–75). Of course, it is OSM's allegation that *any* diversion ditch that is partially on or adjacent to the fill is not as environmentally sound over the long term as a diversion ditch that is located in natural ground completely off the fill. That, however, is not the standard to be applied. The standard set by Congress is whether or not the requested temporary relief (in this case allowing a continuation of the construction of this fill with diversion ditches partially on the fill) will adversely effect the public health or safety or cause significant *imminent* environmental harm to land, air, or water resources. This is not a public health or safety problem, and in light of the fact that Clinchfield Coal personnel are still working on the sight and can monitor the effectiveness of these diversion ditches, there is no risk of significant imminent environmental harm.

The only real issue presented, and the one addressed by ALJ McGuire, is whether there is a substantial likelihood that Clinchfield Coal will prevail on the merits. I believe that they will.

## IV. *Interpretation of Virginia Regulations*

The underlying questions in this case are the scope of authority given to a state which has achieved primacy under the Surface Mining Act, and what reliance, if any, permittees can place on the decisions of the appropriate state regulatory body. The Commonwealth of Virginia submitted a state program to the Secretary of Interior which was designed to be "consistent with" the Act and the regulations of the Secretary. The Secretary has defined the term "consistent with" as follows:

(a) With regard to the Act, the state laws and regulations are no less stringent than, meet the minimum requirements of and include all applicable provisions of the Act.

(b) With regard to the Secretary's regulations, the state laws and regulations are no less effective than the Secretary's regulations in meeting the requirements of the Act.

30 C.F.R. § 730.5.

Where there are differing interpretations on the meaning of the federal or state regulations, can the state make an interpretation, or is OSM's interpretation the binding one?

The State's program was carefully patterned after the then-current regulations of the Secretary. The provisions for the disposal of excess spoil include both general requirements and specific requirements. The general provisions of V816.71 include some very important language that is not part of the Secretary's regulations, but which was approved by the Secretary. V816.71(d) states that all diversions shall be placed in natural ground *unless* an alternate plan or design is approved by the Division. Later regulations at V816.74 set out specific requirements dealing with durable rock fills. William Bledsoe, Technical Services Manager of DMLR, testified before the ALJ that the exception in V816.-71(d) was added prior to submitting the plan to OSM to respond to industry concerns that the steep slope conditions in southwest Virginia might sometimes make it unfeasible to construct diversion ditches solely in natural ground and that, even if feasible, more environmental damage might be caused than with an alternative design. DMLR put a specific exclusion in V816.71(d) to allow some flexibility in design when site restrictions prohibited construction in natural ground. (Tr. at 132). This provision was approved by OSM. Conrad Spangler, III, the Chief Engineer of

DMLR, confirmed Bledsoe's testimony that it has been and continues to be DMLR's interpretation that the general provision of V816.71(d), which allows variances to the requirement that ditches be in natural ground, is controlling over V816.74, the specific requirements for rock fills. (Tr. at 138–141). Spangler also gave examples of other instances in the Virginia regulations where a general variance supersedes specific criteria. (Tr. at 141–42). Virginia followed its interpretation of its own regulations in granting a permit amendment to Clinchfield Coal.

The sole basis for the issuance of this Notice of Violation is that OSM disagrees with Virginia's interpretation of Virginia regulations. (Tr. at 203). OSM feels that the specific requirements for durable rock fills should take precedence over any variance procedure that may be allowed under the Virginia regulations. OSM claims that its interpretation of the intent of federal regulations and its oversight authority give it the power to issue this N.O.V.

At one level, this case is simply a matter of statutory construction. The federal regulations, specifically 30 C.F.R. § 816.73(d) and (f), state that surface water run-off shall not be allowed to flow onto the fill and should be diverted into stabilized channels and that surface water run-off from the adjacent to and above of the fill shall be diverted off the fill to properly designed channels. The Secretary strictly construes these provisions and their counterparts in the Virginia regulations so that "off the fill" means completely and entirely off the fill, thus precluding the construction of diversion ditches at the interface of the fill and natural ground. I see this as a somewhat ambiguous question which might require a look at the legislative intent, particularly in the absence of the phrase "in natural ground" in Subsections (d) and (f) which is present in Subsection (e).

■ However, assuming OSM's interpretation of the regulations is a correct one, the next question is whether V816.71(d) provides for a variance which can control over the more specific regulations. Since

there is no equivalent provision in the federal regulations, the interpretation of the agency promulgating these regulations, DMLR, should be accorded great weight. DMLR has the authority to promulgate variances to the requirement that the diversion ditches be placed in natural ground, and this authority was confirmed when the Secretary approved the Virginia program. I am convinced that this authority was intended by DMLR to include variances to the specific requirements governing durable rock fills. If so, are the Virginia regulations or the interpretation given them by DMLR "consistent with" the federal regulations? OSM believes that they are not. I have not inquired into whether OSM's oversight power means that its interpretation of the federal regulations must be followed by the states. Even if OSM's oversight extends that far, it does not automatically follow that OSM has the authority to issue an N.O.V. to a mining company who has complied with state regulations.

## V. *OSM's Authority to Issue N.O.V.'s*

The Surface Mining Act includes extensive provisions for the enforcement of the Act under the Permanent Program, codified at 30 U.S.C. § 1271. Section (a)(1) describes the circumstances under which the Secretary can order a federal inspection. An inspection can be ordered if no state authority exists or if the state regulatory authority fails within ten days after notification to take appropriate action to cause an alleged violation to be corrected, or to show good cause for such failure. Section (a)(2) grants OSM the power to issue cessation orders. The language in the Act is quite specific when it says that the Secretary shall immediately order cessation when it determines that a condition or practice exists or that a violation of the Act exists which also "creates an imminent danger to the health or safety to the public or is causing and can reasonably be expected to cause significant, imminent environmental harm." 30 U.S.C. § 1271(a)(2). This provision, which allows cessation orders to be issued based on *any* federal

inspection, must be contrasted with the authority granted under Subsection (a)(3). That section states as follows:

(3) When on the basis of a *Federal inspection which is carried out during the enforcement of a Federal program* or a *Federal lands program, Federal inspection pursuant to section 1252; or section 1254(b)* of this title, *or* during *Federal enforcement* of a State program *in accordance with subsection (b)* of this section, the Secretary, or his authorized representative determines that any permittee is in violation of any requirement of this chapter or any permit condition required by this chapter; but such violation does not create an imminent danger to the health or safety of the public, or cannot be reasonably expected to cause significant, imminent environmental harm to land, air, or water resources, the Secretary or authorized representative shall issue a notice to the permittee or his agent fixing a reasonable time but not more than ninety days for the abatement of the violation and providing opportunity for public hearing.

30 U.S.C. § 1271(a)(3). (emphasis added.)

Section (a)(3) is the statutory authority under which OSM issued an N.O.V. to Clinchfield Coal. There was no enforcement of a Federal program involved, nor enforcement under § 1252 prior to approval of a state program. Subsection (b) deals with federal enforcement of a state program beginning with the period when public notice is given that a state is failing to enforce its state program or any part thereof effectively. No such procedure has been instituted against the Commonwealth of Virginia. Section 1254(b) states only that "In the event that a State has a State program for surface coal mining, and is not enforcing any part of such program, the Secretary may provide for the Federal enforcement, under the provisions of § 1271 of this title, that part of the State program not being enforced by such State." 30 U.S.C. § 1254(b).

██ It does not appear that the OSM inspection of Sycamore No. 5 on November 15, 1984, fell within any of the specific types of inspections listed under 30 U.S.C. § 1271(a)(3) which would allow the Secretary to issue a notice of violation to the permitee. So what is the source of OSM's authority to issue this N.O.V.? I can only conclude that it is 30 C.F.R. § 843.12(a)(2), which grants to OSM the power to issue N.O.V.s on the basis of any federal inspection when the state fails to take appropriate action, regardless of whether there exists an imminent danger of environmental harm. Based upon a brief review of the legislative history of Section 1271 of the Act, it is my initial impression that this regulation goes beyond the scope of authority granted to OSM under the Act, and is in direct conflict with the intent of Congress to grant enforcement powers to the states except in those limited circumstances where there is imminent danger of environmental harm. As stated in the Senate report on S.7, the Surface Mining Control and Reclamation Act of 1977:

In order to prevent federal-state overlap, the federal inspector is only to use his authority under Section 421(a)(3) where the Secretary is the regulatory authority. However, in other circumstances, the Secretary must be sure in accordance with the provisions of Section 421(a)(1) that the state is notified of the compliance problem so that it may act under the terms of the approved state program.

S.Rep. No. 95–128, 95th Cong., 1st Sess. 92 (May 10, 1977)

The House and Senate legislative histories go into great detail to explain the federal-state relationship during inspections and enforcement. The House report explained the need for the expansive powers under Section 521(a)(2):

The imminent danger or environmental harm closure provision is so critical that the federal inspector is required to act even if the inspection is being made for purposes of monitoring the state regulatory authority's performance. To provide otherwise would be to perpetuate the possibility of tragedy such as the

Buffalo Creek flood, which can be at least partially attributed to the sad fact that government regulation of the collapsed mine waste banks fell between the cracks of the not quite meshed functions of various state and federal agencies. H.Rep. No. 95–218, 95th Cong., 1st Sess. 129–30 (April 22, 1977), U.S.Code Cong. & Admin.News 1977, 593, 661, 662.

But this authority is distinguished from the authority to issue notices of violation under Section 521(a)(3), which applies only when the Secretary is the regulatory authority or federal inspection is being conducted pursuant to other sections of the Act. *Id.* at 130. *See also* S.Rep. No. 95–128 at 91. The Secretary's regulation at 30 C.F.R. § 843.12(a)(2) significantly expands the authority of the OSM beyond that set forth in the Act.

In promulgating this regulation, the Secretary solicited comments on the correct interpretation of the Act and the legislative history. The Secretary concluded that:

> . . . . .

> If OSM cannot issue a notice of violation following the State regulatory authority's refusal or failure to take action in the first instance, then the Federal inspection under Section 521(a)(1) may be pointless. One answer to this statement is that the point of the Federal inspection in such a situation is to gather information for a Section 521(b) proceeding (OSM taking over all or a portion of a State program). The difficulty with this argument is that, as a practical matter, it would leave a large gap in the enforcement scheme of the Act.

> \* \* \* \* \* \*

> As a legal matter, issuance of notices of violation fills a void or gap in the Federal enforcement scheme—a gap between the existence of the uncorrected violation and the prerequisite showing for Section 521(b) proceedings to take over enforcement of a State program. As Judge Flannery has stated in *In re: Surface Mining Regulation Litigation,* 452 F.Supp. 327, 11 E.R.C. 2078 (D.D.C.,

August 24, 1978), the Secretary has the authority to fill gaps in the statutory scheme with implementing regulations which are consistent with that scheme. 44 Fed.Reg. 15303 (March 13, 1979).

Evidently this regulation was subjected to significant criticism, because on December 1, 1981, OSM proposed a change in the regulations deleting the last sentence of § 843.12(a)(2) to reflect OSM's belief that "... where an approved State program is in force, OSM may lack authority to issue citations directly to permittees except in those limited circumstances where public health and safety, or significant imminent environmental harm would justify issuance of a cessation order under section 521(a)(2) of the Act." 46 Fed.Reg. 58467 (December 1, 1981). Final agency action was deferred pending completion of a Supplemental EIS on the environmental impacts of OSM's regulatory reform effort. 47 Fed.Reg. 17269 (April 21, 1982). Further comments were invited, 47 Fed.Reg. 20631 (May 13, 1982), and this proposed change was not promulgated along with other Permanent Regulatory Program Modifications. 47 Fed.Reg. 35630 (August 16, 1982). Finally, on March 3, 1983, OSM issued a statement of policy that 30 C.F.R. § 843.12(a)(2) was properly and lawfully promulgated. 48 Fed.Reg. 9199 (March 3, 1983). It is obvious that there is disagreement, even within OSM, on the nature of the federal-state enforcement relationship under the Act.

This issue obviously is quite complex and must be more fully explored on the merits of the case. My review of the statute and limited portions of the legislative history confirms my initial impressions of this case. If the term "primacy" is to have any meaning, then the state regulatory authority must have principal responsibility for interpreting and enforcing its own regulations and the Surface Mining Act. If the state fails to enforce the Act, then OSM may take action to withdraw approval of the state program under 30 U.S.C. § 1271(b). I do not believe that Congress intended the OSM to serve as a duplicative regulatory body, conducting inspections

and directly issuing notices of violation, especially where the state authority has made a determination that no violation exists. Based upon these conclusions, I find that there is a substantial likelihood that Clinchfield Coal will prevail on the merits of their case, and that OSM will be prevented from enforcing the N.O.V. in question. I believe that ALJ McGuire's determination to the contrary is inconsistent with the law. Accordingly, Clinchfield Coal is entitled to temporary relief.

The Clerk is directed to send certified copies of this Memorandum Opinion to Administrative Law Judge McGuire and to all counsel of record.

### ORDER

For the reasons set forth in a Memorandum Opinion filed this date, it is hereby ADJUDGED and ORDERED that:

1. Clinchfield Coal's request for temporary relief under 30 U.S.C. § 1276(c) is GRANTED; and

2. The Defendants are hereby enjoined from issuing a cessation order to Clinchfield Coal for failure to obey N.O.V. 84–13–290–12. This injunction shall remain in effect until the Application for Review has been heard on the merits, a decision rendered and any appeals completed.

The Clerk is directed to send certified copies of this Order to all counsel of record.

### On Motion for Reconsideration

The Defendants, Donald Hodel and the United States Department of Interior (the "Secretary"), have filed a motion under Fed.R.Civ.P. 59 asking that this Court reconsider its Order of June 20, 1985, granting Plaintiff's request for temporary relief under 30 U.S.C. § 1276(c). The Secretary argues that this Court lacks subject matter jurisdiction to review the provisions of 30 C.F.R. § 843.12 under the Fourth Circuit's Opinion in *Commonwealth of Virginia, ex rel, Department of Conservation and Economic Development v. Watt,* 741 F.2d 37 (4th Cir.1984). The Secretary further contends that this ruling will seriously impair the Secretary's ability to enforce the minimum standards established by the Surface Mining Act.

The background of this case is discussed at length in the Memorandum Opinion of June 20, 1985. Clinchfield Coal is the permittee of a surface coal mining operation in Dickinson County, Virginia, which is within the venue of this Court. On September 25, 1984, Office of Surface Mining (hereinafter "OSM") issued a ten-day notice concerning an alleged violation at Clinchfield Coal's Sycamore No. 5 operation. Following an additional inspection on November 9, 1984, Notice of Violation No. 84–13–290–12 (N.O.V.) was issued to the Clinchfield Coal Company on November 15, 1984. The purported violation was a failure to divert surface water run-off from the fill into properly designed channels located off the fill in natural ground as required by Virginia Regulation 816.74(d), (e) and (f) and 30 C.F.R. § 816.73(f). Clinchfield Coal filed an application for review of and temporary relief from this N.O.V. which was heard before an Administrative Law Judge on February 4, 1985. The ALJ denied temporary relief on March 7, 1985, and Clinchfield Coal appealed to this Court.

Temporary relief is available on direct appeal from an adverse determination of an Administrative Law Judge under 30 U.S.C. § 1276(c) and 43 C.F.R. § 4.1267(b). Under 30 U.S.C. § 1276(a)(1), "any other action constituting rulemaking by the Secretary shall be subject to judicial review only by the United States District Court for the district in which the surface coal mining operation is located." Under this provision, jurisdiction was proper in the Western District of Virginia for Clinchfield's appeal. The Secretary did not challenge this Court's jurisdiction to hear Clinchfield Coal's petition until after the Opinion of June 21st was filed. Even now, the Secretary does not contest the District Court's jurisdiction to review the propriety of his enforcement actions. The Secretary concedes that review of the procedural and substantive validity of enforcement actions is authorized by 30 U.S.C. § 1275 and

§ 1276 and is proper in this Court. The issue raised by the Secretary is whether this Court's jurisdiction extends to a review of the validity of the Secretary's regulation.

In the case of *Commonwealth of Virginia v. Watt,* the Fourth Circuit relied on its earlier Opinion in *Tug Valley Recovery Center v. Watt,* 703 F.2d 796 (4th Cir.1983) in holding that "attacks on administrative action, taken in accordance with the Secretary's regulations, amount to attacks on the regulations themselves" and may be heard only in the District Court for the District of Columbia. 741 F.2d 40. The court reversed the decision of the District Court in *Jaward Corporation v. Watt,* 564 F.Supp. 797, 799 (W.D.Va.1983) which had enjoined the Secretary's promulgated "two-acre exemption" definitions on the grounds that the regulations could be shown to be unreasonable, arbitrary and capricious. 564 F.Supp. 801. What the Fourth Circuit apparently found objectionable was that the District Court based its decision upon its disagreement with the regulations themselves and the economic and environmental advantages and disadvantages of the two-acre exemption. Although *Jaward* arose in the context of a cessation order, the basis for the District Court's action was its view of the "relative merits" of the two-acre exemption. The Circuit Court concluded that Congress set out a single forum for challenges to national mining regulations and wished to foreclose the possibility of conflicting decisions on the *validity* of the National Surface Mining Regulations. 741 F.2d 40–41.

The Court's Order of June 21, 1985 is limited to a grant of temporary relief under § 1276(c) enjoining the Secretary from issuing a cessation order to Clinchfield Coal for its failure to obey the previously issued N.O.V. The issue presented to this Court was whether or not Clinchfield Coal is entitled to temporary relief under the Act. This question turns on whether there is a substantial likelihood that Clinchfield Coal will prevail on the merits in a final determination. 30 U.S.C. § 1276(c)(2); *Virginia Surface Mining and Reclamation Association, Inc. v. Andrus,* 604 F.2d 312 (4th Cir.1979).

In reviewing the merits of Clinchfield's claim, I noted that there are several extremely complex issues involved. The first issue is the correct statutory interpretation of § 816.73(d) and (f) of the Secretary's regulations. The second issue is whether the inclusion of a variance provision in the Virginia regulations which were approved by the Secretary is "consistent with" the Secretary's regulations. The third issue noted is whether the oversight authority of the Office of Surface Management gives it the authority to override provisions of Virginia regulations and DMLR interpretations of Virginia regulations where those regulations have received initial approval from the Secretary.

The Secretary apparently concedes that this Court has jurisdiction over these issues even though their resolution requires interpretation of the Secretary's regulations. Neither the statute nor the Fourth Circuit's Opinions change this result. In any challenge to an enforcement action by the Secretary, there will inevitably be questions concerning the proper interpretation of the Secretary's regulations and whether those regulations were properly applied to the particular factual situation. Although the Secretary's interpretation of its regulation is entitled to great weight, such interpretation is not binding upon this Court. Merely because the regulations themselves are at issue in an enforcement proceeding, it does not follow that every enforcement proceeding is an attack upon the regulations themselves which must be heard in the District Court for the District of Columbia.

However, it is my opinion that the decisive issue in this case is the question of which of two regulating bodies, the federal or the state, has the power to issue authoritative interpretations of the Virginia regulations and to enforce those interpretations against mining operators. The Secretary has argued that its interpretations, not those of DMLR, are binding on the operators. This issue implicitly calls into ques-

tion the Secretary's authority under the Surface Mining Act, as well as the nature of "primacy". After careful consideration, it was this Court's conclusion that there are serious questions concerning the Secretary's authority to issue notices of violation. It may not be necessary to reach the questions surrounding the enforcement authority of the Secretary because this case might be resolved on one of the issues described above over which the Court's jurisdiction is clear. Clinchfield Coal is not foreclosed from raising the validity of the Secretary's enforcement regulations as a defense to an enforcement action. The Secretary's regulation at 30 C.F.R. § 843.-12(a)(2) is not a substantive regulation setting out requirements for mining operations. Rather, it is the purported authority under which the Secretary has taken enforcement action against Clinchfield Coal. If the Surface Mining Act has not provided the Secretary with such authority, then his enforcement action cannot stand.

Nevertheless, I recognize that challenges to the *validity* of the Secretary's regulations may not be proper in this Court. The question of jurisdiction was raised *sua sponte* in the earlier opinion to ensure that all relevant questions could be properly briefed. After all administrative remedies have been exhausted, then it may be necessary to decide whether challenges to the Secretary's authority can be raised in this Court as a defense to an enforcement action, or whether they can only be raised in the District Court for the District of Columbia. If the latter conclusion is reached, then this case should be transferred to that forum.

In the interim, I do not agree with the Secretary that there is no jurisdiction over this case, nor does *Commonwealth of Virginia v. Watt* divest this Court of jurisdiction. Jurisdiction over the application for temporary relief is clear. Unlike the District Court in *Jaward*, the remedy granted to Clinchfield Coal is directed at the Secretary's enforcement procedures. *See Commonwealth of Virginia v. Watt*, 741 F.2d at 40. The Opinion of June 21 did *not* pass on the validity of the Secretary's authority;

it only concluded that Clinchfield Coal was likely to prevail on the merits. Which forum will ultimately hear this case on the merits is still to be determined.

For these reasons, the Motion for Reconsideration based upon this Court's lack of jurisdiction will be denied. Any substantive argument on the validity of the Secretary's regulations and the difficulties that would result if those regulations are not upheld are more probably addressed when this case returns to this Court.

The Clerk is directed to send certified copies of this Memorandum Opinion to all counsel of record.